## THE STATE v. THE FREEHOLDERS OF HUDSON COUNTY.

1. The regulation of ferries, and other *means* of internal communication between the states, is not vested by the constitution of the United States in Congress; the power remains with the states.

2. The power of fixing the rates to be taken at the ferries within their counties, given to the board of freeholders by the "Act concerning ferries," passed February 6, 1799, authorizes them to fix the rates to be taken at a ferry where one terminus is within their county, even although the other terminus is out of the state.

3. The board of chosen freeholders of the county of Hudson have power to regulate the rates of ferriage to be taken at the ferry from Jersey City to the city of New York.

On *certiorari* to the board of chosen freeholders of Hudson county.

The object of this writ was to bring up an order of the board of chosen freeholders of the county of Hudson, by which they undertook to fix the rates of ferriage at the ferry in Jersey City. The *certiorari* was prosecuted by the New Jersey Railroad and Transportation Company.

The proceedings returned with the writ were simply the resolution of the board of freeholders of Hudson county, fixing the rates of ferriage to be taken at " the Jersey City ferry." Depositions were taken showing that there is a ferry, having one terminus at Jersey City, known as " the Jersey City ferry," conducted by the New Jersey Railroad and Transportation Company, the other terminus of which is in New York.

Argued before NEVIUS and CARPENTER, Justices, sitting apart in the branch court.

*A. Whitehead* and *B. Williamson*, for plaintiff, objected that the order was vague and uncertain. That it is, in regard to the rates to be taken at the Jersey City ferry, but that it does not define what it intended by this designation ; from whence or to what place does not appear in the order.

That this order is not authorized by the act, (act February 6, 1799,) *Rev. Stat.* 542. The act only authorized the chosen freeholders to fix the rates to be taken at the ferries within their county, and does not apply to a ferry across a river into

another county, much less into another state.   One landing place will not constitute a ferry.    *Jac. Law Dic. art. "Ferry ;" Webster, in verb "Ferry."*

There were formerly ferries within the several counties of the state to which the act would apply.   Some of the provisions of the act show that it is rather applicable to small streams in the interior than to a great river.

If a ferry is between two counties, how is the jurisdiction to be apportioned, there being no special provision for such case ? The right of legislation over external waters belongs to congress alone.   The case of the *People* v. *Babcock*, (11 *Wend.* 586) is distinguishable.

*Certiorari* will lie to review this order.   *Saxton* 287.

*Zabriskie*, contra.   There is but one ferry in Jersey City, which is known as the " Jersey City ferry."   See act seventh February, 1818, *(Pamph.* 88).

The power of the board to make such order is amply sustained by the act.   The act is remedial, the object being to prevent the imposition of extortionate rates upon passengers, and should be so construed as to be effectual.   It repeals and supplies former acts, which applied in terms to ferries on waters exterior to the state.   See *Allinson* 30, 38, 39, &c.

The word *within* may be construed as referring to the rates taken within the county.

The terminus is frequently treated as the location of the ferry. See act November 3, 1821, *(Pamph.* 9) in regard to Hoboken ferry.

The power to regulate rates to be taken at ferries on exterior rivers, established under the authority of this state, has been frequently exercised by the legislature.   In 1849, the legislature passed five such acts in regard to ferries from this state to Philadelphia and other places.

In New York, an act authorizing the courts of common pleas to license ferries " *in* their respective counties," was held to apply to a ferry across Niagara river, the ferry master residing in the state of New York.   *People* v. *Babcock*, 11 *Wend.* 586 ; *New York Rev. Laws, 1st vol.* 527.

This ferry was erected *within* the county of Hudson, and is to be there regulated, although the exercise of the franchise necessarily extends beyond the county.

The regulation of ferries is a mere police regulation, which is within the legitimate control of the state. 11 *Wend.* 590; 9 *Wheat.* 203.

The whole previous course of legislation regulating ferries and their rates, expressly regulating the rates at exterior ferries like this, and licensing them and this very ferry by name, shows that this act, which repeals the former acts, and was intended to supply their place, was intended to apply to them. *Pamph. Laws* 1786, 377.

CARPENTER, J.   This writ of *certiorari* was issued in order to test the validity of an order of the board of chosen freeholders of the county of Hudson, regulating the rates of ferriage to be taken at the ferry in Jersey City.   The order was made under the supposed authority of the act concerning ferries, passed February 6, 1799, *Rev. Stat.* 542.   By the first section it is enacted, that the board of chosen freeholders shall fix the rates to be taken at the several ferries *within* their respective counties, and the same, from time to time, revise, alter, amend, or make anew, at their discretion.   I suppose the only real point in this case is the construction of this act, and whether, under it, the board of chosen freeholders had any authority to make the order in question.   It is insisted that this act, by its very terms, applies to ferries over the waters in the interior of the state only, and not to those ferries over rivers bounding the state, the franchise being partly exercised over waters beyond the jurisdiction of the state.

I do not doubt as to the constitutional power of the legislature to regulate the exercise of the right of ferry by any person holding a dock or wharf in this state, although the passage may, in part, be over the waters of an adjoining state. The jurisdiction of the state extends to the centre of the stream, and the franchise may be regulated and controlled to that extent upon conditions which may affect the whole transit.   The state may certainly prescribe the terms upon which ferries

shall be conducted on its own waters. In *Gibbons* v. *Ogden*, (9 *Wheat.* 1), it is distinctly conceded that this power, which belongs to the sovereignty of a state, and is essential to the regulation of its internal police, has not been surrendered to the national government, and that the clause in the constitution, giving power to Congress " to regulate commerce with foreign nations and among the several states," does not include it. It has always been claimed and exercised by the several states between which a ferry is practicable and convenient. 11 *Wend.* 591. It is true that there might be conflicting legislation on an opposite shore, but however this might embarrass the operations of such ferry, it would not affect the jurisdiction of this state over its own waters. The acts passed by the legislature establishing ferries between this state and New York or Pennsylvania, and regulating the rates to be taken, several of which have been referred to by counsel, are instances of the exercise of this power.

But it is said that this ferry is not within the county of Hudson, and that the power to regulate rates has not been delegated to the chosen freeholders of that county. It is argued that a ferry is a place or passage where boats pass over water to convey passengers, &c., and that a landing on both sides of a stream is necessary to constitute a ferry. It is said that one landing place does not constitute a ferry ; that a man who owns a wharf where a steamer may stop has not, therefore, a franchise of ferry.

There can be no question as to the meaning of the word *ferry*, when used in the common law sense of a franchise or right of ferry. The definition given in *Termes de la Ley* is " a liberty, by prescription or the king's grant, to have a boat for passage upon a great stream for carriage of horses and men for reasonable toll." The term, according to the common law of England, implies an exclusive right of conveyance, and can only be set up by license from the crown. While it may be a right to convey one way only, there must, at least, be a right to land on the opposite shore, or the franchise cannot beneficially exist. 13 *Vin.* 208 ; *Jac. Law Dic.* art. " *Ferry ;*" *Blissett* v. *Hart, Willes* 508 ; *Peter* v. *Kendall,* 6 *B. & C.* 703 ;

*Pim* v. *Currell,* 6 *M. & W.* 234 ; *Ferry Co.* v. *Barker,* 2 *Exch.* 136.

But, in this country, whoever claims an exclusive privilege must show a grant from the legislature ; and this, like many other franchises which fill a large space in the English law, exists here on a very different footing. Subject to be controlled by general regulations, I suppose a right of ferry attaches to every riparian owner, of which he cannot be deprived for the benefit of others, except for some legal purpose, and after due compensation. But whatever may be the general doctrine as to ferries, either at common law or as modified in this country by our institutions and laws, it has little bearing on the present inquiry. We are now only concerned with the construction of our statute, and the investigation now is simply to ascertain the meaning of the statute, and the sense in which the word is there used.

In order to ascertain the proper construction of the act, it will, as suggested, be necessary to look at the object of the act, and the circumstances under which it was passed. The act of 1799 repealed and supplied several former acts on the same subject, by which the rates were limited and other regulations prescribed, not only on the interior, but the exterior waters of the state. The first act on the subject, that I have observed, was passed March 17, 1713–14, (*Allinson's Laws* 30). It authorized the governor of the state to license such person or persons as he might appoint to keep and manage a ferry, erected by that act, across the Delaware, from the city of Burlington to the town of Bristol, in Pennsylvania, and regulated the rates to be taken. The same act further imposed a penalty upon any person, not so licensed, who should interfere with the business of the licensed ferryman. A subsequent act was passed, which vested the profits of this ferry in the inhabitants of the city of Burlington. *Act June* 17, 1783, *Wilson* 334. January 26, 1716–17, (*Allinson* 38) the legislature passed an act regulating the rates of ferry to be taken from Amboy to New York, from Weehawk to New York, from Burlington to Philadelphia, and across the Raritan at New Brunswick. Again, December 6, 1769, (*Allinson* 333) an act was passed,

the title of which is, " An act more effectually to regulate fer-
rymen and ferries *within* this colony." It applied, in express
terms, to ferrymen employed in carrying passengers, &c., not
only on waters within the colony, but also from any place
within the colony to any place in New York, Pennsylvania,
and Delaware, and imposed penalties in case of any neglect
or delay in the performance of their duties. On the 21st
December, 1771, still another act was passed regulating rates
to be taken at the ferries on the north and south sides of Rari-
tan river (Perth Amboy and South Amboy) to Staten Island,
as well as across the Raritan. *Allinson* 364.

I have not referred, in this recapitulation of acts previous to
1799 concerning ferries, to the different acts regulating ferries
over the small streams in the interior. The latter, when the
act now in force was passed, and indeed previously, were
constantly becoming of less importance, the ancient ferries
over such waters, as the settlement of the state progressed,
being superseded by bridges. But, as the population of the
country increased, the great ferries over the exterior waters of
the state, the acts in relation to which I have shortly referred
to, yearly became of more and more consequence, and involved
pecuniary interests of great magnitude. It is obvious that this
legislation in regard to those ferries gave no title to the ferry
across the exterior rivers, in the strict common law sense of
the term *ferry*, as it could convey no authority to land on the
opposite shore in another state. While, in some cases perhaps,
it was the design, by the grant of special privileges, to en-
courage persons to set up ferry establishments on our shores,
yet in all a leading object was to prevent the imposition of
exorbitant charges. Where special privileges were granted,
still all who entered upon the employment and undertook the
duties of ferrymen, while subject to the restrictions imposed
by the laws of this state, were yet left to acquire the necessary
rights on the opposite shore, as they best could. The state or
the colony could grant no rights beyond its own boundaries.
The legislation referred to operated, and could operate only
on those who, seated at termini within the state, were there-
fore subject to her laws. In these acts, the term *ferry* is some-

times evidently employed to designate the establishment set up at the terminus within the state, as well as, at other times, used in reference to the transitus or entire passage across the water.

Such of these acts as remained in force were finally repealed, and supplied by the act of February 6, 1799, by which general regulations were prescribed for the ferries which had grown up under the encouragement and control of the state. It was still equally important to secure the due performance, by ferrymen, of their duties at the important ferries situate on the border of the state, and to prevent the imposition of extortionate fare. The first section of the act of 1799, as already referred to, provides that the chosen freeholders shall fix the rates of fare to be taken at the several ferries within their respective counties. Looking at this act in connection with the previous course of legislation, (the prior acts repealed by it regulating ferries on the exterior, as well as the interior waters of the state,) and obviously having the same general object in view, can we doubt that it was intended to reach to the same extent? When passing the act of 1799, concerning ferries, an act which supplied the previous acts on the same subject, the legislature never could have meant, by the phrase "ferries within their respective counties," to exclude from the provisions of the statute nearly all the important ferries in the state. The narrow construction contended for would have left not only all the ferries on the borders of the state unprovided for, but all ferries on streams between different counties, and in such case the law would have operated on a few ferries only, mostly of comparatively small importance. It would have left, at the time of the passage of that act, the most important ferries without restraint as to their charges, and without any means provided in order to compel the performance of their duties. I think, from these considerations, we are forced to the conclusion that the word *ferry*, in the first section of the act of 1799, is used in its popular sense, and, as it seems sometimes to have been used in other acts, to designate the wharf and establishment set up at the terminus within the state. At any rate, for the purpose of this act, the ferry is said to be

within the county where the ferry establishment is maintained, and the board of chosen freeholders of such county are authorized to fix the rates. It is said that the power has never been exerted by any board of chosen freeholders in regard to this ferry, nor, until lately, in regard to any ferry in the same county. This may be so, but the power has been exerted, and submitted to, in regard to other ferries similarly situated in another part of the state.

A decision of the Supreme Court of New York, cited on the argument, lends much aid to this conclusion. An act of the state of New York, regulating ferries, imposed a penalty on ·any person who should use any ferry across any river or other water without first obtaining a license, and it authorized the courts of common pleas to license "ferries in their respective counties." The act was held to extend to a ferry over Niagara river, for the conveyance of passengers into Canada. The jurisdiction of the state could extend only to the centre of the river, but the ferry establishment, and, in part, the transitus, were within that jurisdiction. For the purposes of that act, the ferry was held to be in the county. *The People* v. *Babcock*, 11 *Wend.* 587.

I have no difficulty as to what class of ferries the act was intended to apply. I hold that it applies to all ferries *de facto*. This very ferry is recognised in 1786, as an existing ferry. By an act passed in that year, entitled, "An act for raising revenue from certain stages, ferries, and taverns," all persons keeping ferries were required to take out a license, and a yearly tax of £50 was required to be paid for its license by this very ferry. A similar tax, varying in amount, was, by the same act, imposed upon other ferries in the state, several of them upon the exterior waters of the state, the word being obviously applied to the ferry establishment within the state. In designating the ferry at New Brunswick, the expression on *both sides* is used in the act, clearly in consequence of the sense thus given to the word. However, then, this ferry may have originated, and whether it rests upon any franchise received from the government, or whether it rests only on the rights of riparian ownership, it has been frequently recognised

by the state as an existing ferry, and controlled, in common with other similar establishments, by its legislation.

The act of 1799 was passed long before steam had affected the character of ferry transportation, and it contains, of course, many provisions entirely inapplicable to the existing state of things. The numerous acts incorporating ferry companies, which in most instances limit the rates to be taken by the companies so created, have doubtless rendered the act of less general importance than it was at the time when it was passed. It may be remarked, also, that the great pecuniary interests involved in this particular ferry may, perhaps, create a doubt as to the expediency of delegating a power so important to a mere local body, one possibly, as suggested, liable to be affected by conflicting interests and hostile feelings. But all these considerations cannot affect the proper construction of the act by a judicial tribunal; they should be addressed to the legislature, where they might possibly lead to the revision of a law now somewhat antiquated in its provisions.

I have come to the conclusion that the order should be affirmed.

NEVIUS, J., concurred in the affirmance.

AFFIRMED, 4 *Zab.* 718. CITED *in State* v. *Trenton,* 7 *Vr.* 501.